## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| **MARGARITO MIKE REYES,** §<br>Petitioner, §<br>§<br>**v.** §<br>§<br>**RICK THALER, Director,** §<br>**Texas Department of Criminal Justice,** §<br>**Correctional Institutions Division,** §<br>Respondent. § | **Civil Action No. 4:10-CV-608-Y** |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND NOTICE AND ORDER

This cause of action was referred to the United States Magistrate Judge pursuant to the

provisions of 28 U.S.C. § 636(b), as implemented by an order of the United States District Court for

the Northern District of Texas. The Findings, Conclusions, and Recommendation of the United

States Magistrate Judge are as follows:

## I. FINDINGS AND CONCLUSIONS

### A. NATURE OF THE CASE

This is a petition for writ of habeas corpus by a state prisoner under 28 U.S.C. § 2254.

### B. PARTIES

Petitioner Margarito Mike Reyes, TDCJ-ID #1459504, is a state prisoner in custody of the

Texas Department of Criminal Justice, Correctional Institutions Division, in Cuero, Texas.

Respondent Rick Thaler is the Director of the Texas Department of Criminal Justice,

Correctional Institutions Division.

## C. Factual and Procedural History

On August 15, 2007, a jury found petitioner guilty of indecency with a child and aggravated

sexual assault of a child and assessed his punishment at five and ten years' confinement,

respectively, in Erath County, Texas, Case Nos. CR12639 & CR12640. (1Clerk's R. at 72; 2Clerk's

R. at 78)[1]  In affirming the trial court's judgment, the state appellate court summarized the facts of

the case as follows:

> Reyes was indicted for the offense of indecency with a child. The indictment
> alleged that he touched the complainant's genitals with the intent to arouse or gratify
> his sexual desire at a time when the complainant was younger than seventeen years
> of age and not his spouse. The complainant in this case chose the pseudonym of
> "Fluffy." Reyes was also indicted for the offense of aggravated sexual assault. The
> indictment alleged that he intentionally or knowingly caused the penetration or
> contact of the sexual organ of the complainant by his sexual organ at a time when the
> complainant was younger than fourteen years of age and not his spouse. The
> complainant in this case chose the pseudonym of "Junior."

> [Donna] Wright[, a pediatric nurse practitioner and sexual assault nurse
> examiner for Cook's Children's Medical Center,] testified that, upon referral by CPS
> for concerns of sexual abuse, she interviewed the complainants and their mother.
> Wright indicated that, when Jessica ("Fluffy's" mother) brought her in, she said it
> was because there was "touching by her stepdad." Jessica related that the touching
> was on "Fluffy's" back, her stomach, and her breasts. "Fluffy" told Wright that her
> stepdad touched her on her breasts and "kind of" in her private spot. Wright said that
> "Fluffy" answered, "Yes," when Wright asked her if her stepdad had touched her
> private spot with his private spot and if it went inside her private spot. She related
> that "Fluffy" also said her stepdad put his finger inside her private spot. "Fluffy"
> further indicated that her stepdad had put his mouth on her private spot and had
> rubbed her private spot. According to Wright, "Fluffy" said that her stepdad's
> private spot felt wet.

> Wright acknowledged that her physical exam of "Fluffy" showed that her
> female sexual organ, her genitalia, and her anal area were all within normal limits.

---

[1]"1Clerk's R." refers to the trial court clerk's record in Case No. CR12639; "2Clerk's R."
refers to the trial court clerk's record in Case No. CR12640.

When asked if there was any physical evidence that sexual intercourse had occurred with the child, Wright replied that there was no trauma. She insisted that this was consistent with what the child was telling her because of the nature of the tissue in the genital area and the length of time since the activity described by the child had occurred. Wright testified that she diagnosed "Fluffy" with sexual abuse, no genital or anal trauma.

Wright testified that Jessica, the complainants' mother, told her that, after "Fluffy" told what Reyes had done, "Junior" told CPS that Reyes had raped her. Wright indicated "Junior" told her that Reyes had put his penis and his finger into her private part and that he had put his finger in her anal area. "Junior" also said that Reyes had his mouth on her private and that she had to put her mouth on his private. She also said that he rubbed on her private and touched her on her breasts. Wright said that "Junior" told her this had happened two years before the interview, when she was twelve years of age. Wright related that she did not expect there to be any physical evidence after that length of time. Wright acknowledged that her exam of "Junior" showed no trauma in her genital or anal area. She indicated that her diagnosis with respect to "Junior" was sexual abuse, no anal or genital trauma. Wright related that an intact hymen is not determinative of whether a person has engaged in sexual intercourse, even if it has been multiple times.

"Junior" testified that she did not love Reyes because he never let them "have a life." She indicated that she saw him touch her sister "Fluffy" on her privates. She said they did not tell their mother because they were scared she would not believe them. "Junior" indicated that she told "Fluffy" what had happened to her and told her not to tell. She related that she had also told her friends and a school counselor about what was happening. She also said she told CPS what had happened to her and her sister. She indicated that she loved her mother and wanted to go back and live with her and that she knew that, if she said she was making everything up, she could go home and be with her mom. However, she said she did not want to do that because Reyes needed to pay for what he did.

"Junior" testified that, when she was in fifth grade, Reyes put his penis inside her, in her front part. She said she was telling the truth but that she was afraid her mother would not believe her. On cross-examination, "Junior" testified that her parents were really strict with her, with Reyes being more strict than her mother. She enumerated several things he was strict about that related to her hanging out with friends or making phone calls. She insisted that no one had ever told her to say anything that was untrue and that she did not want to take any of it back.

"Fluffy" testified that, on the occasion when "Junior" saw Reyes touch her, he was touching her under her pants on her female parts. She said this happened other times as well. She insisted there was nothing she could do to make Reyes stop touching her.

On cross-examination, "Fluffy" acknowledged that Reyes and her mother were pretty strict on her. Additionally, she acknowledged that she was upset when, after she went to a football game instead of a volleyball practice, her mother and Reyes made her quit volleyball. She indicated that it was the next day when she told the counselor at school that Reyes was touching her under her shirt. She also acknowledged that she told Jack Carr that Reyes touched her in her private part with his hand, while telling someone at Cook Children's Hospital that he touched her with his penis and his finger. She denied that she told her mother that she had "made all of this up." Later, when asked if Carr wanted to talk to her about things she had told her mom about this not happening, she replied, "I don't remember."

Carr testified that he is employed as a reserve investigator with the Erath County Sheriff's Department. He referred to several interviews with Reyes prior to his arrest. He indicated that Reyes was cooperative and that he did not admit to committing any crime. He related that he gave both girls every opportunity to correct what they were telling him if they were saying it for some other reason but that they reaffirmed their statements. He denied that the complainants' mother ever came to him and said that one of the girls wanted to change her story.

The defense offered a video of an interview in September with Reyes, which was played for the jury. Carr acknowledged that Reyes was not arrested after the interview and, in fact, was not arrested until after the case's second presentation to the grand jury the following February.

On redirect examination, Carr testified that he did not find anything in his investigation indicating that the girls were using their story as a front. On recross-examination, Carr said that "Junior" said in a statement that Reyes put his finger in her private part and also "put his penis . . . and he kept touching her with his finger in her private parts." He also indicated she said she saw Reyes touching her sister in her private parts with his finger. He also said that she said in the statement that it happened over a long period of time. He related that she said that there was penetration with Reyes's penis and with his finger, as well as touching with his hand. Also on recross-examination, Carr said that "Fluffy" indicated in her statement that Reyes had touched her breasts and private parts with his hand.

4

Sergeant Matthew Mull of the Texas Department of Public Safety testified that he interviewed Reyes concerning the charges made by the complainants. He indicated Reyes at first denied having any contact at all with "Fluffy," while later saying that he had contact with her breasts on numerous occasions while they were engaged in wrestling or horseplay. He stated that, with respect to "Junior," Reyes at first denied contact with her. Then he said that he had touched her breasts on two occasions and once "had placed his hand and grabbed [the] waistband of her pants." He related that Reyes denied touching "Junior's" vagina. On cross-examination, Sergeant Mull acknowledged that Reyes had not admitted to any criminal activity. On redirect examination, Sergeant Mull testified that he did not feel like Reyes was being truthful.

Tracy Bettis testified that she is a junior high school counselor for the Stephenville Independent School District. She indicated that she knew both of the complainants because they were each receiving special education services for deficiencies in English and reading or writing. She said that neither child was retarded. She related that, in September 2006 after a conversation with "Fluffy," she took her to talk to the school nurse, Joan Pope. Bettis said that, following that conversation, she made a report to the CPS Statewide Abuse Hotline. She indicated that the reputation of both "Fluffy" and "Junior" for truthfulness was good. During cross-examination, she acknowledged that "Fluffy" was only in school for about six weeks. However, she said that that was enough time for her to express an opinion as to Fluffy's truthfulness because those who are not truthful really stand out.

Pope testified that she is the school nurse to whom Bettis testified she brought "Fluffy" before reporting abuse to CPS. She indicated that she knew both complainants. With respect to "Junior," she related that she had not had any encounters of "a non-truth." She added that she had not heard about any non-truth from anyone else. With respect to "Fluffy," she stated that she had never heard of anything being not true. She stated that, if she was told something by either of the complainants, she would believe it.

Jessica Reyes, the complainants' mother, testified that she and Reyes had been married almost twelve years. She indicated that the children and Reyes had a good relationship and that he treated them like they were his children. She said she and Reyes both were the disciplinarians in the family. She related that they disciplined the complainants by sending them to their room, taking away the television, grounding them, or adding chores, as opposed to hitting them. She spoke of restrictions concerning their movement around the neighborhood, their bedtime, and their clothing. She indicated that the complainants would lie but "not big, big lies" and that they did not lie very often. Jessica testified that "Fluffy" lied to her by

5

telling her she was going to volleyball practice when she had gone to a Tarleton football event instead. She indicated that, as punishment, she and Reyes had taken her out of volleyball but that she had continued in it without their knowledge. She insisted that "Fluffy" was really upset about being taken out of volleyball. She said "Fluffy" was upset with Reyes about this.

Jessica testified that, after being notified by CPS about the allegations the complainants were making, she called Reyes and told him about them. A tape recording made of a telephone conversation between Jessica and Reyes was played to the jury. According to Jessica, the conversation took place when she called Reyes from the police station after the initial conversation in which she told him about the charges. She insisted that, if Reyes had sexually assaulted "Junior," she would have known it because she slept with her bedroom door open and lived in a very small trailer house. She said that neither girl told her what happened.

Jessica testified that at first she believed the complainants but that she changed her mind later when they seemed happy and not traumatized after Reyes was out of the house. She indicated that, one day when she was with "Fluffy," "Fluffy" said, "[I]t didn't happen," without saying what she was referring to.

Jessica acknowledged that CPS had previously removed her son from her custody because of a failure to protect him. She said she did not have anything against CPS over that. She acknowledged that she lied to the grand jury when she testified that Reyes had not had contact with the complainants since they were removed. She later contended that Reyes's visit to the house was beyond the time limit specified on the CPS safety plan. She concluded her cross-examination testimony by saying that she did not know if the complainants were telling the truth. On redirect examination, Jessica said she believed they were lying.

Wayne Samuel Weaver testified that he was appointed to represent the complainants in a CPS case in which they had been removed from their home. He indicated that, when he told them they could go live with their mother if they would tell everyone that they had made the story up, "Fluffy" said, "[O]kay." He stated that she said she really wanted to go home that badly. However, when he asked her if she was making it up, she said, "[N]o." He said he had no reason to doubt the credibility of the complainants.

Reyes testified that he and Jessica were strict on the girls. He said this included monitoring who their friends were and where they went and denying the use of cell phones and internet. He indicated that, if he ever touched the complainants

in an inappropriate place, it was not intentional and would have occurred in the context of wrestling or horseplay. He denied ever having sex with either of the complainants. He testified that "Fluffy" was mad at him for taking her off the volleyball team. He indicated that all of these allegations came right after the volleyball incident. He spoke of his cooperation with law enforcement authorities and CPS, saying that he did everything that was ever asked of him by any authority figure dealing with the case.

On cross-examination, Reyes testified that, before these accusations, he would not have considered the complainants as liars. He indicated that they had never accused anyone else of sexually assaulting them. He said he was aware of the incident when "Junior" walked in when he was with "Fluffy" but denied that his hands were in her pants. He concluded his testimony by saying that he did not have sexual intercourse with or touch either of the complainants inappropriately and that they were saying he did because they were mad at him and wanted him out of the house. He indicated that, in the end, they would probably get their way.

*Reyes v. State*, Nos. 11-07-270-CR & 11-07-271-CR, 2009 WL 1165547, at *2-5 (Tex. App.–Eastland Apr. 30, 2009) (not designated for publication).

Petitioner did not file a timely petition for discretionary review, but filed a state application for writ of habeas corpus, raising the claims presented herein, which was denied without written order by the Texas Court of Criminal Appeals on the findings of the trial court. (State Habeas R. at cover) This federal petition followed.

## D. ISSUES

Petitioner raises tens grounds for relief, in which he claims he received ineffective assistance of counsel at trial and on appeal. (Pet. at 8 & Insert) Petitioner's grounds are multifarious and addressed as thoroughly as practical.

## E. Rule 5 Statement

Respondent asserts that petitioner has sufficiently exhausted his state court remedies as to the claims presented and that the petition is not barred by limitations or subject to the successive-petition bar. (Resp't Ans. at 4-5)

## F. Discussion

### 1. Legal Standard for Granting Habeas Corpus Relief

Under 28 U.S.C. § 2254(d), a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless he shows that the prior adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court. 28 U.S.C. § 2254(d). A decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court of the United States on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). A state court decision will be an unreasonable application of clearly established federal law if it correctly identifies the applicable rule but applies it unreasonably to the facts of the case. *Williams*, 529 U.S. at 407-08.

Further, the statute requires that federal courts give great deference to a state court's factual findings. *Hill*, 210 F.3d at 485. Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. The applicant has the burden of rebutting the

presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Thus, factual determinations by a state court are presumed correct absent clear and convincing evidence to the contrary, and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(2), (e); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams*, 529 U.S. at 399. Typically, when the Texas Court of Criminal Appeals denies relief in a state habeas corpus application without written opinion, it is an adjudication on the merits, which is entitled to this presumption. *See Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997).

## 2. *Ineffective Assistance of Counsel*

A criminal defendant has a constitutional right to the effective assistance of counsel at trial and on a first appeal as of right. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Anders v. California*, 386 U.S. 738, 744 (1967). An ineffective assistance claim is governed by the familiar standard set forth in *Strickland v. Washington*. 466 U.S. at 668. *See also Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001) (applying the *Strickland* standard to ineffective assistance claims against appellate counsel). To establish ineffective assistance of counsel an applicant must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Strickland,* 466 U.S. at 687, 697.

Petitioner raised his ineffective assistance claims in his state habeas application, and the state habeas judge, who also presided over petitioner's trial, conducted a hearing by affidavit. Based on trial counsel's affidavit and his own personal recollection of the trial proceedings, the state habeas court found petitioner's claims against trial counsel were generally "without legal or factual merit." (State Habeas R. at 99)[2] Based on appellate counsel's affidavit, the state habeas court entered express factual findings refuting petitioner claims against appellate counsel and concluded petitioner was not denied his right to effective assistance of counsel on appeal. (Supp. State Habeas R. at 65-66) The Texas Court of Criminal Appeals denied the state application without written order on the findings of the trial court. (*Id.* at cover) This constitutes an adjudication on the merits by the state court and is entitled to the presumption of correctness. Thus, this court must defer to the state courts' determination of the claims unless it appears the decision was contrary to or involved an unreasonable application of *Strickland* or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence in the state court proceedings. *Bell v. Cone,* 535 U.S. 685, 698-99 (2002).

### (A) Trial Counsel

In eight grounds, petitioner claims he received ineffective assistance of counsel at trial because counsel failed to (1) call witnesses for the defense, (2) request a pre-hearing *Daubert* challenge of the state's expert witness, (3) request an instruction to disregard improper questioning, (4) employ an effective trial strategy, (5) establish the admissibility and relevancy of evidence, (6)

---

[2]"State Habeas R." refers to the court record in petitioner's state habeas application no. WR-73,429-01.

request a limiting instruction, (7) object to persecutor misconduct, and (8) advise and assist him in trial procedures.

The state habeas court did not enter express findings of fact as to these claims. Under these circumstances, a federal court may assume that the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied, and imply fact findings consistent with the state court's disposition. *Townsend v. Sain*, 372 U.S. 293, 314 (1963)[3];*Pondexter v. Dretke,* 346 F.3d 142, 148 (5th Cir. 2003); *Catalan v. Cockrell*, 315 F.3d 491, 493 n.3 (5th Cir. 2002). Thus, the undersigned assumes the state court applied the *Strickland* attorney-performance standard to petitioner's claims against trial counsel and made factual findings consistent with the denial of the claims and will defer to the state courts' determination of petitioner's claims unless it appears the decision was contrary to or involved an unreasonable application of *Strickland* or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence in the state court proceedings.

In petitioner's first ground, he claims trial counsel was ineffective by failing to call witnesses for the defense. (Pet'r Mem. in Support at 10; Pet'r Reply at 3) Counsel responded in his affidavit that petitioner participated in the discussion process and agreed and consented to call certain witnesses in his defense and not to call others based on what was in petitioner's best interest. (State Habeas R. at 96) Complaints based upon uncalled witnesses are not favored in federal habeas review because "speculations as to what these witnesses would have testified is too uncertain." *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002); *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir.

---

[3]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

1985). Therefore, to show the prejudice required to support an ineffective assistance claim premised on the failure to call a witness, a petitioner must show that the witness was available and would in fact have testified at trial in a manner beneficial to the defense. *Evans*, 285 F.2d at 377. In the state habeas proceeding, petitioner did not submit any affidavits by uncalled witnesses themselves, or offer any evidence that they would have been willing to testify on his behalf and that their testimony would have been favorable.[4] Petitioner's bald allegations that witnesses were available and would have been willing to testify at trial in a manner beneficial to the defense do not overcome the strong presumption that his counsel's actions were reasonable. *Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001). Furthermore, the state court, which was familiar with counsel and his performance in petitioner's trial, made an implicit credibility determination in favor of counsel and against petitioner. Such determinations are entitled to the presumption of correctness. *Richards v. Quarterman*, 566 F.3d 553, 562 (5th Cir. 2009)

In petitioner's second ground, he claims trial counsel was ineffective, given the absence of physical evidence of sexual abuse, by failing to request a pre-trial *Daubert/Robinson/Kelly* challenge to the testimony of Donna Wright, the state's expert medical witness. (Pet'r Mem. in Support at 11; Pet'r Reply at 4-5) Counsel responded in his affidavit that after reviewing Wright's credentials, he determined that such a challenge to her testimony would be unsuccessful and not in the best interest of petitioner. (State Habeas R. at 96; RR, vol. 7, at 25) The record supports counsel's decision that

---

[4]In this federal proceeding, petitioner has submitted the affidavit of his mother, however "review under § 2554(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." (Pet'r Appx. E at 1) *Cullen v. Pinholster*, — U.S. —, 131 S. Ct. 1388, 1398 (2011); *Pape v. Thaler*, — F.3d —, 2011 WL 2476437, at *3 (5th Cir. June 23, 2011).

Wright was well qualified as an expert in the area of child sexual abuse and any such challenge would have been futile. (RR, vol. 7, at 25-29) Counsel is not required to make futile motions or objections. *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990).

In petitioner's third ground, he claims trial counsel was ineffective by failing to object and/or request a curative instruction and move for a mistrial to what he characterizes as improper and hostile questioning and comments by the prosecutor during cross-examination of petitioner and his wife. (Pet'r Mem. in Support at 12; Pet'r Reply at 6) Petitioner complains counsel should have objected and/or requested a curative instruction and moved for a mistrial when the prosecutor asked his wife, Jessica, if she needed to be told not to let a pedophile around her children and if she was still going to continue living with petitioner regardless of the outcome of the trial and when the prosecutor commented that "[i]t looks to me like they [the victims] were right going to somebody besides you, they got help from the school nurse." (Pet'r Mem. in Support at 13; RR, vol. 7, at 245-46, 251-52) Counsel did not object to the second question, whether petitioner would continue to reside in the home regardless of the outcome of the trial, however the question does not appear objectionable. Counsel is not required to make frivolous motions or objections. *Id.* Counsel did object to the first question and the prosecutor's improper comment, which the trial court sustained.

Additionally, petitioner complains counsel should have objected and/or requested a curative instruction and moved for a mistrial when the prosecutor asked him "is it that you have an aversion to molesting your own daughter" and "[s]tepdaughters are okay with you, but not your own daughter." (*Id.* at 305-06) Counsel did not object to these questions. The prosecutor also questioned both petitioner and Jessica about violating the "safety plan" devised by CPS, without objection. (*Id.* at 243, 250, 296) Petitioner asserts counsel should have objected to the latter and

instructed "the jury of the governing law regarding the state's failure to issue a protective order" versus implying that he and his wife violated the law by violating the "safety plan." (Pet'r Mem. in Support at 12-14)

Counsel responded in his affidavit that "[t]he objections that were made in response to cross examination by the State were made to the best of our ability and in the best interest of" petitioner. (State Habeas R. at 97) Counsel made objections when he felt it was appropriate, and his decision not to object to other portions of cross-examination was not outside the range of professionally competent assistance. Nor has petitioner explained how the allegedly improper cross-examination and remarks could have affected the outcome of his trial.

In petitioner's fourth ground, he claims counsel was ineffective by employing an ineffective trial strategy. (Pet'r Mem. in Support at 14-16; Pet'r Reply at 6-7) More specifically, petitioner asserts counsel was deficient by calling the victims' attorney ad litem, Wayne Weaver, as a witness, failing to cross-examine Joan Pope, the school nurse, and failing to issue a subpoena for the victims' volleyball coach, Ms. Green. According to petitioner, had counsel cross-examined Pope and subpoenaed Ms. Green to testify, he could have elicited testimony that "Fluffy" lied to her mother about going to volleyball practice when she had gone to a Tarleton football event instead. Counsel responded in his affidavit that petitioner "was kept completely informed throughout of our trial strategies and I informed [petitioner] of the witnesses called and why. [Petitioner] insisted that we call Mr. Weaver to testify. (State Habeas R. at 97)

A habeas court cannot second guess counsel's strategic decisions. *Strickland,* 466 U.S. at 690-691. Decisions regarding which witnesses to call is a matter of trial strategy. Clearly, counsel called the attorney ad litem as a witness in an attempt to show that one of the girls had agreed to say

they "made this story up" in order to go home and that the girls wanted to be at home with their mother without petitioner present because he was too strict. (RR, vol. 7, at 254-55) Counsel's decision was not so poorly chosen that it rendered petitioner's trial unfair. *See United States v. Cotton*, 343 F.3d 746, 753 (5th Cir. 2003). Similarly, whether or not to cross-examine a witness is a matter of trial strategy. *See Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983). To succeed petitioner must show how cross-examination would have changed the trial's outcome. *Id.* Given the fact that "Fluffy" herself admitted her untruth regarding volleyball practice and that she was upset at petitioner who forced her to quit the team, Pope's or Green's testimony on the topic would have been cumulative at best and would likely have had no effect on the outcome of petitioner's trial. (RR, vol. 7, at 89-90)

In petitioner's fifth ground, he claims counsel was ineffective by failing to establish the admissibility and relevancy of letters allegedly written by the victims that would have shed light on their behavior with peers and their knowledge of sexual conduct. (Pet'r Mem. in Support at 16-18; Pet'r Reply at 7-8) In response, counsel stated:

> Concerning the letters in issue, our trial strategy was to have the letters admitted into evidence. The Judge as the gate keeper of evidence would not allow them to be admitted over our objection.

(State Habeas R. at 97)

The record supports counsel's assertion. On two occasions, counsel attempted to get the letters and/or the content of the letters into evidence. (RR, vol. 7, at 114, 307-08) On both occasions, the state objected to admission of the letters or the content of the letters on relevancy grounds and/or under rule 412 of the Texas Rules of Evidence, the state's rape shield law, and the trial court sustained the state's objections. (RR, vol. 7, at 115-19) This claim has no factual basis.

15

In petitioner's sixth ground, he claims counsel was ineffective by failing to request a contemporaneous limiting instruction when extraneous offense evidence was admitted at trial and on the "culpability requirement of a voluntary act pursuant to Tex. Penal Code § 6.01(a)." (Pet'r Mem. in Support at 18-2-; Pet'r Reply at 8-9)  The record reflects counsel filed a pretrial motion for a limiting instruction, which was addressed at the pretrial hearing, and the trial court instructed the jury that it could not consider the evidence of extraneous offenses unless they were proven beyond a reasonable doubt. (1Clerk's R. at 64; 2Clerk's R. at 70)  Counsel responded in his affidavit that he observed no need for a limiting instruction during trial. (State Habeas R. at 97)  Although it is quite possible that the trial court would have given a contemporaneous limiting instruction to the jury each time extraneous offense evidence was admitted, petitioner has not shown that he was prejudiced.  This is particularly true in view of the fact that the trial judge included an appropriate limiting instruction in the jury charge.

Further, in support of his claim that counsel was ineffective for not requesting an instruction on voluntariness, petitioner refers the court to § 6.01(a) of the Texas Penal Code, which provides that a person commits an offense only if he voluntarily engages in the conduct, including an act, an omission, or possession. TEX. PENAL CODE ANN. § 6.01(a) (Vernon 2003).  According to petitioner, any inappropriate touching on his part was accidental and that such an instruction was "necessary due to the physical contact of roughplay." (Pet'r Mem. in Support at 19)  Involuntary conduct is a defense to prosecution under state law.  *Trujillo v. State,* 227 S.W.3d 164, 169-70 (Tex. App.– Houston [1st Dist.] 2006, pet. ref'd).  A defendant is entitled to an instruction regarding the voluntariness of his actions when he timely requests an instruction on the issue and it is raised by the evidence.  *Brown v. State,* 955 S.W.2d 276, 278-79 (Tex. Crim. App. 1997).  "Voluntariness"

refers only to one's physical bodily movements. *Rogers v. State,* 105 S.W.3d 630, 638 (Tex. Crim. App. 2003). "If those physical movements are the nonvolitional result of someone else's act, are set in motion by some independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness, hypnosis or other nonvolitional impetus, that movement is not voluntary." *Id.* The issue of voluntariness of one's conduct, or bodily movements, is separate from the issue of one's mental state. *Adanandus v. State,* 866 S.W.2d 210, 230 (Tex. Crim. App. 1993). But "involuntary act" is not the same defensive theory as "accident." *Rogers,* 105 S.W.3d at 639. Petitioner's testimony that he may have touched the victims inappropriately during "horseplay" did not raise the voluntariness of his actions but the question of his intent. (RR, vol. 7, at 297-300) Moreover, an instruction on voluntariness under § 6.01(a) is necessary only if the accused admits committing the act or acts charged and seeks to absolve himself of criminal responsibility for engaging in the conduct. *Trujillo,* 227 S.W.3d at 169; *Bell v. State,* 867 S.W.2d 958, 962 (Tex. App.–Waco 1994, no pet.). "When a person claims the involuntary act defense he is conceding that his own body made the motion but denies responsibility for it." *Rogers,* 105 S.W.3d at 639 n.30 (quoting Sanford H. Kadish, *Excusing Crime,* 75 Cal. L. Rev. 257, 259 (1987)). Here, petitioner adamantly denied committing the offenses charged. (RR, vol. 7, at 284-85) Thus, he was not entitled to a voluntariness instruction and counsel was not ineffective by not requesting such an instruction.

In petitioner's seventh ground, he claims counsel was ineffective by failing to object to the prosecutor's improper jury argument striking at him over the shoulders of his counsel. (Pet'r Mem. in Support at 20-21; Pet'r Reply at 10; Pet'r Appx. A, at 69-70) Specifically, petitioner complains of the following argument during the guilt/innocence phase:

17

[Y]ou can take the words of upstanding, reputable people in the community that know these girls, that say, hey, those are truth tellers. If there was one person on the face of this earth, other than the defendant, who had a bad opinion of these girls, you can take it to the bank that they would have been up there telling you. They had the power of subpoena, those lawyers over there, just like we do, and if there's somebody that thinks poorly of these girls, they can get on that witness stand, take an oath, and tell you.

(RR, vol. 7, at 335)

Petitioner also complains of the following argument during the punishment phase:

The defendant is still denying that he committed this, he sat through this trial and watched these two kids have to get on this witness stand and to put up with what they had to put up with, knowing he did this, and then wants to put his other kiddo up there, Stella. These people, they're like chattels to him, these are just things for him to use . . . .

(*Id.*, vol. 8, at 25)

Counsel responded in his affidavit that he did not object because he observed no improper comments during the prosecutors' closing arguments. (State Habeas R. at 97) Texas law provides that proper jury argument must fall within one of four categories: (1) summary of the evidence; (2) reasonable deduction from the evidence; (3) in response to argument of opposing counsel; and (4) plea for law enforcement. *Coble v. State*, 871 S.W.2d 192, 204 (Tex. Crim. App. 1993); *Borjan v. State*, 787 S.W.2d 53, 55 (Tex. Crim. App. 1990). Having reviewed the closing arguments in their entirety, the complained of remarks during the guilt/innocence phase were in response to defense counsel's argument that the victims were liars and were, thus, permissible. (RR, vol. 7, at 331-32) In the second instance, the complained of remarks were a plea for law enforcement or an appeal to the jury to act as the conscience of the community in accessing petitioner's punishment and were likewise permissible. *Harris v. State*, 122 S.W.3d 871, 888 (Tex. App.–Fort Worth 2003, pet. ref'd).

18

Counsel is not required to make frivolous objections. *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998).

Finally, petitioner claims in his eighth ground that trial counsel was ineffective by failing to advise and assist him in trial procedures. (Insert to Pet.) Specifically, petitioner complains that counsel failed to poll the jury, failed to allow him to speak on his own behalf during the point of allocution, and failed to assist him in filing a notice of appeal or a motion for new trial. (Pet'r Mem. in Support at 21-22; Pet'r Reply at 10) The record reflects the trial court asked for and received confirmation from the jury that each juror agreed upon the verdicts and that the verdicts were unanimous. (RR, vol. 7, at 339-40) Under these circumstances, counsel was not ineffective by not polling the jury. In response to the remaining claims, counsel stated in his affidavit that petitioner consented to allow him to speak for petitioner when petitioner was asked if he had a statement in his own behalf prior to sentencing. Counsel further stated that he personally advised and admonished petitioner of his right to file a motion for new trial and notice of appeal. (State Habeas R. at 97) Petitioner's conclusory allegations to the contrary, without support in the record, will not support an ineffective-assistance claim. *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983).

### (B) Appellate Counsel

Petitioner claims he received ineffective assistance of counsel on appeal because counsel (1) failed to consult with him and amend or supplement appellant's brief to include additional issues and (2) terminated his representation of petitioner before mandate issued, resulting in the deprivation of petitioner's ability to continue his appeal. (Insert to Pet.; Pet'r Mem. in Support at 22-26; Pet'r Reply at 11-13; Pet'r Supp. Brief at 1-16) Appellate counsel responded to the allegations as follows:

I represented the Applicant as retained counsel with regard to the conviction[s] challenged herein. In Ground Nine of the writ application the Applicant contends that I did not consult with him as to the matters to be raised in his motion for new trial. Upon being retained I consulted with the Applicant who was then incarcerated and also with his family in my office as to the grounds to be raised on appeal at length as well as indigency for the costs of the record. I also spoke with the trial court Judge, the Prosecutor who tried the cases and with one of trial counsel about the course of the proceedings. I also consulted with the Applicant's family on several other occasions as requested by Applicant. It did not appear to me at that time that an ineffective assistance of trial counsel claim would be able to be successfully advanced on appeal.

During the time that I represented the Applicant [he] requested that I not send copies of his case materials to him while incarcerated because he feared reprisals by other inmates if they learned of the nature of his charges which he felt sure they would discover if I sent his case materials to him while he was incarcerated. I did send status letters on the case, without specific details set forth therein, to keep Mr. Reyes advised of the progress of his case, together with copies of the briefs and the opinion/orders of the Court of Appeals.

I informed the Applicant that many of the matters he wished to raise dealt with the issue of ineffective assistance of his trial counsel and that I would not be raising them because in order to effectively litigate the same an affidavit from defense counsel would be required. I informed the Applicant that ordinarily such matters are raised in a post conviction habeas corpus petition. I further advised the Applicant that if raised and litigated in the motion for new trial or on direct appeal and the Court of Appeals did not sustain those grounds that he would be forever barred from raising any kind of ineffective assistance of counsel claim later on. I further advised the Applicant, and his family members, that there was insufficient time to secure an affidavit from trial counsel, that there was no way to force trial counsel to supply an affidavit in time for a motion for new trial hearing and that in my experience trial court Judge's [sic] do not require trial counsel to supply such affidavits in response to a motion for new trial. I also advised the family and the Applicant that the Trial Court Judge did not have to hold a hearing and could deny the motion for new trial without considering any evidence in its discretion. Having explained all of these matters to the Applicant and to his family the decision was made by them that such issues should not and would not be litigated until after the appeal was concluded and it became necessary to file a writ petition. I took all necessary steps to secure all of the Applicant's appellate rights and advocated all meritorious claims on his behalf on appeal. As appellate counsel in this case I listened to all of the input from the family and the Applicant and reviewed the content of his letters to me and determined that such matters that he wanted to raise were not able to be raised on appeal because (1) there was not sufficient record on

which to made [sic] a good faith assertion of the same, (2) that habeas corpus was the most effective method to raise the claims, and (3) that to raise the matters on direct appeal was impractical and potentially more harmful to the Applicant than to wait, and in the event he was unsuccessful on appeal, and raise them in the proper forum and procedural vehicle where they could be better advocated with a degree of success. All meritorious grounds were presented on direct appeal by me except for ineffective assistance of trial counsel (which after reviewing the record of the trial I did not believe would be a valid ground for relief).

In Ground Ten of the writ application the Applicant contends that he was denied effective representation following the affirmance of his conviction on direct review. Undersigned counsel was retained on the express representation that his fee for services would be paid in full. After the payment of the initial retainer no further payment was made although a substantial time passed before the Court of Appeals affirmed the conviction. Upon receiving and reviewing the Court of Appeals' decision and reviewing then applicable law I determined that there were not existent any valid grounds for filing either a motion for rehearing or a petition for discretionary review. At the point that the Court of Appeals affirmed the conviction and in compliance with the rules requiring that notice of the affirmance and the right to file a petition for discretionary review be given a letter was sent to the Applicant pointing out that I did not intend to file a motion for rehearing or a petition for discretionary review because I did not feel that grounds existed for taking such action.

In that letter I also informed the Applicant that my contractual obligations had been fulfilled despite the fact that my fee had not been paid in full. The letter was timely sent. Some time later I received notice that a pro se motion had been filed in the Court of Appeals by the Applicant. I am not aware of whatever happened after that time nor was I responsible therefore as neither the Court, the Applicant, nor his family ever contacted me again.

I do not believe that I rendered ineffective assistance of counsel on appeal to the Applicant as set forth in Grounds Nine or Ten, or in any other respect.

(State Habeas R. at 24-27)

In a supplemental affidavit, appellate counsel further stated, in relevant part:

When I undertook representation I prepared and filed a Notice of Appeal, a Trial Court Certificate of the Defendant's Right of Appeal, a Motion for Proceeding in forma Pauperis and a motion for new trial. A hearing was scheduled on these. The Applicant signed the Pauper's Affidavit and the Trial Court Certification which was joined with the Notice of Appeal on the form then approved for that use by the

Texas Court of Criminal Appeals of Texas. A copy of the documents and the Order approving in forma pauperis was given to the Applicant following the hearing. In the Trial Court Certification the Applicant was advised that following the affirmance of his conviction on appeal he had 30 days to file a petition for discretionary review. These documents are in the trial court's file jacket and in the Clerk's Record for Appeal filed in the applicant's direct appeal in both the trial court and the Court of Appeals.

In compliance with rule 48.4 of the Texas Rules of Appellate Procedure[5] I prepared and sent a letter to the Applicant informing him that his conviction had been affirmed on appeal, advising him of his further appellate rights and that I did not intend to file either a motion for rehearing or a petition for discretionary review on his behalf so as to discharge my duties as appellate counsel to the Applicant.

In that letter, a copy of which is attached hereto as Exhibit "A" . . . I specifically informed the Applicant herein that his case had been affirmed by the Court of Appeals on April 30, 2009, [t]hat I did not intend to file either a motion for rehearing or a petition for discretionary review on his behalf, advised him of the applicable time periods and the proper court to file such pleadings in and advised him of his right to seek habeas corpus review as well if he so chose. I attached to this letter a copy of the Court of Appeals' opinion and a copy of the blank form approved by the Court of Criminal Appeals of Texas for seeking post-conviction habeas corpus relief . . . .

My TRAP, Rule 48.4 letter to the Applicant is dated the day that I sent it certified mail, return receipt requested to him, on May 1, 2009. On May 1, 2009 I had received the Court of Appeals' opinion which had been delivered the day before. I have also enclosed a copy of the green card showing that the TRAP, Rule 48.4 letter and its attachments were signed for on May 5, 2009 (4 days after I had mailed it at which time the Applicant still had [1] 10 days to file a motion for rehearing in the

---

[5]Rule 48.4 provides:

Opinion Sent to Criminal Defendant. In criminal cases, the attorney representing the defendant on appeal shall, within five days after the opinion is handed down, send his client a copy of the opinion and judgment, along with notification of the defendant's right to file a pro se petition for discretionary review under Rule 68. this notification shall be sent certified mail, return receipt requested, to the defendant at his last know[n] address. The attorney shall also send the court of appeals a letter certifying his compliance with this rule and attaching a copy of the return receipt within the time for filing a motion for rehearing. The court of appeals shall file this letter in its record of the appeal.

court of Appeals and [2] 20 days to file a petition for discretionary review in the Court of Appeals to continue his appeal to the Court of Criminal Appeals of Texas.

> In compliance with Rule 48.4, TRAP, requiring notice of the affirmance and the right to file a petition for discretionary review be given[,] my letter was sent to the Applicant, at the address to which I had been informed he was being held, pointing out that I did not intend to file a motion for rehearing or a petition for discretionary review.

> In that letter I also informed the Applicant that my contractual obligations had been fulfilled despite the fact that my fee had not been paid in full. The letter was timely sent.

(State Habeas Supp. R. at 43-46)

Based on counsel's testimony, the state habeas court found that appellate counsel timely advised petitioner that his conviction had been affirmed by the court of appeals and that counsel timely advised petitioner that he had a right to file a pro se petition for discretionary review. (Supp. State Habeas R. at 65-66) The court concluded that appellate counsel met his duty to advise petitioner of the possibility of review by the Texas Court of Criminal Appeals after rendition of judgment by the court of appeals, that counsel's actions or inactions did not deprive petitioner of his opportunity to timely prepare and file a pro se petitioner for discretionary review, and that petitioner had not been denied effective assistance of counsel on appeal. (*Id.*)

Appellate counsel is not required to raise every conceivable argument urged by his client on appeal, regardless of merit. *Smith v. Robbins,* 528 U.S. 259, 287-88 (2000). It is appellate counsel's duty to assess and choose among potential issues, according to his or her professional judgment of their merits and the strategic approach being taken. *Jones v. Barnes,* 463 U.S. 745, 749 (1983). Furthermore, appellate counsel is correct that, under state law, an application for writ of habeas corpus is usually the more appropriate vehicle to raise ineffective assistance claims against trial

23

counsel. *See Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003). Counsel should ordinarily be given an opportunity to explain his actions before being condemned as unprofessional or incompetent. *Id.* at 111; *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Finally, deferring to the state court's factual determinations and the documentary exhibits presented by appellate counsel, it appears counsel fully informed petitioner of his rights as required by state law. TEX. R. APP. PROC. RULE 48.4. (Supp. State Habeas R. at 47-50)

In summary, petitioner has failed to present convincing evidence or compelling argument to rebut the presumption of correctness of the state courts' adjudication of his ineffective assistance claims. Thus, applying the presumption of correctness, the state courts' denial of habeas relief is not contrary to, or involve an unreasonable application, of *Strickland*.[6]

### 3. *Evidentiary Hearing*

Petitioner requests an evidentiary hearing to further develop the record in support of his claims, however federal habeas review of state-court proceedings are limited to the record before the state court. *Cullen v. Pinholster*, — U.S. —, 131 S. Ct. 1388, 1398-1401 (2011). Petitioner's claims were adjudicated on the merits in state court, and he has failed to overcome the limitation of § 2254(d)(1) on the record that was before the state court. *Id.*

## II. RECOMMENDATION

Petitioner's petition for writ of habeas corpus should be denied.

---

[6]To the extent petitioner complains of alleged infirmities and defects in the state habeas proceedings, including the state court's failure to hold an evidentiary hearing to resolve disputed factual issues and render findings of fact and conclusions of law, such claims are not cognizable on federal review. *See Rudd v. Johnson*, 256 F.3d 317, 320 (5th Cir. 2001); *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999).

### III. NOTICE OF RIGHT TO OBJECT TO PROPOSED
### FINDINGS, CONCLUSIONS AND RECOMMENDATION
### AND CONSEQUENCES OF FAILURE TO OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The court is extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation until August 10, 2011. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

### IV. ORDER

Under 28 U.S.C. § 636, it is ordered that each party is granted until August 10, 2011, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation. It is further ordered that if objections are filed and the opposing party chooses to file a response, a response shall be filed within seven (7) days of the filing date of the objections.

It is further ordered that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED July ____19____, 2011.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE